The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act and the employer-employee relationship existed between the parties at all relevant times.
2. The defendant is a duly qualified self-insured for purposes of the Workers' Compensation Act.
3. The issue for determination is whether the plaintiff has sustained an occupational disease, and, if so, what are the compensable consequences.
4. The parties stipulated the November 2, 1990 claimant's statement, marked as Defendant's Exhibit 1 into the record.
5. The parties submitted the following documents into the record:
 a. Industrial Commission Form 19, dated November 6, 1990;
 b. Twenty-two pages of vocational rehabilitation reports from Page Rehabilitation Services, Inc.; and
c. Three pages of tax/wage information.
* * * * * * * * * * *
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing the plaintiff was a thirty-one-year-old right-hand dominant male who began his employment with defendant Freightliner Corporation on September 2, 1986.
2. The plaintiff began working in the final cab section, where he used pneumatic impact drills and wrenches to install mirrors, headlights and sideview mirrors for large trucks built by defendant. The plaintiff utilized these tools for 35 to 40 minutes per hour.
3. From October 1988 until August 1990, the plaintiff worked in the materials department, where he stocked parts, bolts, and other items for line workers. The plaintiff had no problems with his hands, even though the stocking job required constant use of his hands. However, plaintiff did not have to use any vibratory tools.
4. In August of 1990 the plaintiff began working on the quiet kit line, where side extenders and foil padding was installed. These duties required the use of pneumatic vibratory tools for 45 minutes each hour. The plaintiff's job primarily involved the use of impact guns, drills, air pop rivet guns when installing the two-side extenders on each cab. Each side extender required 28 bolts, which were tightened by use of the pneumatic wrench in bursts of one to two seconds per bolt. The plaintiff worked on 20 sets per work shift, installing rubber strips around the doors.
5. After working in the quiet cab department for about three weeks, the plaintiff developed numbness and pain in his hands. The pain and numbness gradually increased in severity until November 1, 1990. At this time he completed a Claimant's Statement which reported that he had put on 20 sets of side extenders, and that when he began installing door rubber his hand started to swell and hurt.
6. The plaintiff was seen by Dr. Case on November 2, 1990 and began treatment with hand specialist Dr. Warren Burrows on November 6, 1990. Dr. Burrows suspected symptoms of carpal tunnel syndrome, placed plaintiff on light duty, and prescribed medication and wrist splints.
7. Dr. Burrows suspected an underlying arthritic or collagen vascular problem, which he stated could inflame or cause carpal tunnel syndrome symptoms. Dr. Burrows opined that a single traumatic incident could cause an arthritic condition to become symptomatic. Dr. Burrows also opined plaintiff's arthritic condition combined with plaintiff's use of vibratory tools clearly caused plaintiff to develop carpal tunnel syndrome.
8. Dr. Burrows kept the plaintiff on light duty until June 7, 1991 when he was released to regular duty. On June 21, 1991 the plaintiff was returned to light duty.
9. Dr. Burrows subsequently referred the plaintiff to rheumatologist Dr. Patrick Box, and on September 9, 1991 the plaintiff was first seen by Dr. Box. Dr. Box opined plaintiff's carpal tunnel syndrome was occupationally induced and caused by the vibratory tools plaintiff used on his job. A clinical exam revealed a positive Tinel's sign. Based upon these results, Dr. Box found that plaintiff by working for defendant-employer, had a greater risk of developing carpal tunnel syndrome than the general public. Dr. Box referred the plaintiff to neurosurgeon Dr. Stephen Hipp.
10. Dr. Hipp saw the plaintiff on October 21, 1991 at which time the plaintiff was diagnosed with a median nerve contusion.
11. Dr. Box further opined that the median nerve contusion could result from a single episode of direct trauma, such as the October 31, 1990 episode of right hand pain which plaintiff described which occurred from using a rubber mallet. The Full Commission gives greater weight to the opinion of Dr. Burrows and Dr. Box than that of Dr. Hipp.
12. In November of 1991, plaintiff attempted to return to work with the restrictions of not to use any vibratory air tools. However, upon his return to work in November 1991, defendant-employer refused to assign plaintiff any work. Finally, after numerous attempts by plaintiff and plaintiff's counsel to get defendant-employer to assign plaintiff to any work detail, plaintiff was forced by his economic condition to take a medical leave of absence. At this point plaintiff was not fired from his job, but was not given any work within his job restrictions to earn a paycheck from defendant-employer. The plaintiff began a medical leave of absence on November 4, 1991 during which he was paid benefits under the defendant's self-funded extended sick leave pay from November 4, 1991 through February 4, 1993. Benefits were paid at the rate of $1,698.67 per month. Plaintiff took the medical leave because defendants denied that he suffered an occupational disease as a result of the work assigned.
13. Between February 1993 to August 1993, the plaintiff was employed by Sears for 3 to 4 weeks, selling vinyl siding; worked as a waiter 1 1/2 months at Olive Garden Restaurant; and worked 5 to 6 weeks with Courtyard by Marriott and/or Quality Personnel.
14. As a result of his carpal tunnel syndrome, plaintiff was incapable of earning the same wages he earned before his occupational disease in the same employment, or in any other employment from November 4, 1991 through August 1993. However, plaintiff was successful in obtaining limited employment earning diminished wages with various employers between February 1993 and August 1993. As a result of these limited employment opportunities found by plaintiff, defendant-employer is entitled to a credit for the periods of time (February 1993 through August 1993) in which plaintiff worked. Plaintiff returned to work with defendant-employer in another position in August 1993 earning the same wage.
15. Plaintiff's stipulated average weekly wage is $515.20 while he was employed with defendant-employer.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows: CONCLUSIONS OF LAW
1. To be compensable as an occupational disease under N.C.G.S. § 97-53 (13), a disease must be characteristic of a certain trade; not an ordinary disease of life to which the public in general is equally exposed; and there must be a causal connection between the disease and the claimant's employment.
2. Plaintiff's employment exposed him to a greater risk of contracting carpal tunnel syndrome than the general public. Plaintiff has proven by the greater weight of the evidence that his carpal tunnel syndrome is due to conditions and causes characteristic of and peculiar to his employment with defendant-employer. It is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore a compensable occupational disease. Rutledge vs.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
3. Defendant shall pay all medical expenses resulting from plaintiff's occupational disease. N.C.G.S. § 97-25.
4. As a result of plaintiff's carpal tunnel syndrome, he is entitled to temporary total disability benefits of $343.48 per week beginning November 4, 1991 through August 1993. Defendant-employer shall pay in a lump sum the accrued benefits for the period beginning November 4, 1991 through August 1993, less a credit for wages earned by plaintiff between the period of February 1993 through August 1993. Also, defendant-employer is entitled to a credit for the sick leave pay that was paid to plaintiff. Counsel shall confer and resolve the amount of permanent partial disability, if any. In the event that counsel cannot resolve this issue, either party may move the Commission to have this case reset for hearing to present further evidence by deposition testimony or stipulated records. N.C.G.S. § 97-29 and N.C.G.S. § 97-42.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plaintiff's claim for an occupational disease is hereby ALLOWED, and plaintiff is entitled to benefits under the Workers' Compensation Act.
2. As a result of plaintiff's carpal tunnel syndrome, defendants shall pay plaintiff $343.48 per week, beginning November 4, 1991 through August 1993. This sum which has accrued shall be paid to plaintiff in a lump sum.
3. Defendants shall pay all medical expense incurred by plaintiff as a result of this occupational disease.
4. An attorney's fee in the amount of twenty-five percent of the amount due under this Award is hereby approved for plaintiff's counsel. Said amount shall be deducted from the aforesaid Award and paid directly to plaintiff's counsel.
5. Defendants shall pay the costs due the Commission.
FOR THE FULL COMMISSION
 S/ _______________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
CMV/cnp/mj 6/14/95